United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

THE ANSCHUTZ CORPORATION,

Plaintiff,

v.

MERRILL LYNCH AND CO. INC. et al,

Defendants.
_________________________________/

No. C 09-03780 SI

**ORDER RE: MOTIONS TO DISMISS AND STRIKE**

Currently before the Court are defendant Deutsche Bank Securities, Inc.'s motions to dismiss and to strike, defendants Rating Agencies' motion to dismiss and defendant Fitch Ltd.'s motion to dismiss for lack of personal jurisdiction. (Dkt. ## 122, 125, 127 and 131.) Based on the pleadings submitted and arguments made, the Court GRANTS in part and DENIES in part DBSI's motion to dismiss; DENIES DBSI's motion to strike; DENIES the Rating Agencies' motion to dismiss; and GRANTS Fitch Ltd.'s motion to dismiss.

## BACKGROUND

### 1. Procedural background

On March 19, 2010, plaintiff The Anschutz Corporation ("TAC") filed an amended complaint against seven defendants: (1) Merrill Lynch & Co., Inc., (2) Merrill Lynch, Pierce, Fenner & Smith, Inc., (3) Deutsche Bank Securities, Inc., (4) Moody's Investors Service, Inc., (5) The McGraw-Hill Companies, Inc., (6) Fitch, Inc. and (7) Fitch Ratings, Ltd. The claims against the Merrill Lynch defendants, as well as the related claims against Moody's, have been transferred to the Southern District of New York by order of the Judicial Panel on Multidistrict Litigation. *See* MDL Transfer Order,

Docket No. 90.[1] Plaintiff's claims against all other defendants remain before this Court.

The claims brought by plaintiff against Deutsche Bank Securities Inc. (DBSI) are (1) violations of Section 10(b) of the Securities Exchange Act of 1934 (Exchange Act) and Rule 10b-5, (2) violations of the California Corporate Securities Law of 1968, Cal. Corp. Code §§ 25500 and 25501, and (3) common law fraud. Currently before the Court are DBSI's motions to dismiss the FAC and strike portions of the same.[2] The claims brought by plaintiff against The McGraw Hill Companies, Inc. (doing business as Standard & Poors Rating Services ("S&P")), Fitch, Inc. and Fitch Ratings, Ltd. (collectively, the Rating Agencies) are for negligent misrepresentation. The Rating Agencies have moved to dismiss those claims and, separately, defendant Fitch Ratings, Ltd. (FRL) has moved to dismiss for lack of personal jurisdiction.

**2. Factual background**[3]

Plaintiff brings this action to recover damages and for other relief resulting from its purchase of auction rate securities ("ARS")[4] that were underwritten by DBSI and marketed and sold to investors. FAC ¶ 1. Plaintiff claims that it purchased the ARS in reliance on material omissions made directly and indirectly by DBSI. *Id*. Plaintiff alleges that it purchased DBSI's securities based upon an appearance of ready and regular liquidity that was created by the market impact of an extensive pattern of deceptive and manipulative activities by DBSI in connection with the "Dutch auctions."[5] *Id*. Plaintiff alleges that

---

[1] Moody's Investor Service, Inc. rated the Dutch Harbor and Anchorage Finance securities issued by Merrill Lynch. First Amended Complaint (FAC) ¶¶ 146-165.

[2] Pursuant to an unopposed administrative motion, DBSI's motion to strike plaintiff's claim for punitive damages will be considered as having been raised in DBSI's motion to dismiss. Docket Nos. 191, 194.

[3] The facts discussed are taken from plaintiff's FAC or, where noted, from documents subject to judicial notice by the Court.

[4] ARS are long term or perpetual equity or debt instruments that pay interest or dividends at rates set through "Dutch auctions." FAC ¶ 25.

[5] In a "Dutch auction," buy orders are filled beginning from the lowest specified interest rate until all securities available for sale are matched with purchase orders. That rate at which the final sell order is filled is the "clearing rate," and that rate applies to the entire issue of the ARS. FAC ¶28.

it believed it could resell the DBSI securities, at par, in auctions conducted on prescheduled dates. *Id*. Plaintiff also claims to have believed that an investment in these auction rate securities would be extremely safe and highly liquid, and have virtually no risk of loss of principal. *Id*.

Between July 2006 and August 2007, plaintiff purchased the DBSI ARS through the San Francisco office of its agent, Credit Suisse. FAC ¶ 2. Plaintiff alleges that DBSI played three roles in the ARS market: (1) underwriting ARS on behalf of issuers, (2) serving as dealer-brokers, therefore collecting and receiving every buy, sell or hold order for each auction, and (3) serving as a "market maker" for the ARS by placing "support bids" in 100% of the auctions in which DBSI participated as the sole or leading broker-dealer. FAC ¶ 4, 32. According to plaintiff, this third role "ensured that auctions would be successful, as long as [] Deutsche Bank continued to place support bids," because without DBSI's support bids, "there was no market for auction rate securities; they were unsaleable." *Id*. ¶¶ 4-6.

**A. DBSI's Structured ARS and TAC's Purchase**

Plaintiff's claims stem from the purchase of complex derivative-backed ARS from two trusts: The Pivot Master Trust and the Capstan Master Trust (Trusts). FAC ¶ 82. The Trusts were set up by DBSI for the sole purpose of issuing the securities involved in this case. *Id* ¶¶ 82, 83. Plaintiff alleges that the Trusts used the proceeds from their offerings to acquire a series of Credit Linked Notes (CLNs) that had been issued by a special purpose vehicle (SPV) trust, also established by DBSI. *Id*. ¶ 83. The proceeds received by the SPV were invested in medium term notes or deposit accounts held by DBSI or an affiliate. *Id*. The SPV then entered into a series of credit default swaps (CDS) with Deutsche Bank AG, DBSI's parent company. *Id*. ¶ 84. A CDS is a contract between two parties through which one of the parties purchases protection or insurance against any losses associated with some specified "reference" entity. Here, Deutsche Bank AG purchased protection from the SPV that DBSI had established, and the medium term notes and deposit accounts purchased by the SPV served as collateral for the CDS transactions. *Id*. The "reference" securities were a portfolio of corporate bonds held by Deutsche Bank AG. *Id*. As such, plaintiff alleges that the SPV provided a form of insurance against the performance of the Deutsche Bank AG portfolio of bonds, "agreeing to compensate the Deutsche

Bank AG office in the event the bonds were downgraded or otherwise failed to make payments of interest or principal." *Id.* Thus, in return for a "nominal 'premium,'" Deutsche Bank AG received a guarantee that it would be made whole in the event that it suffered losses on its portfolio of corporate bonds, "offloading the risk from its balance sheet onto the shoulders of unsuspecting investors several steps down the chain." *Id.*

Plaintiff alleges that the interest rate range for the securities issued by the Trusts was narrowly circumscribed and tied to their ratings. *Id.* ¶ 90. DBSI structured these securities as ARS in order to market them as short-term, liquid notes rather than as "fixed-income notes with maturity dates some 10 years in the future." *Id.* ¶ 91. Plaintiff specifically alleges that because the interest rates were fixed at such a low range, the securities "would have been unsaleable without [DBSI's] undisclosed, manipulative, and deceptive practices" of fixing auctions to make the securities seem liquid, and that "no investor would have purchased long-term notes with a 10-year maturity date that paid only short-term interest rates." *Id.*

Relatedly, plaintiff explains that the ARS at issue were not available to the public in general. Instead, because these securities were unregistered, they were available only to a limited group of "qualified institutional buyers" (QIBs) like TAC. FAC ¶ 180. TAC, as an institutional buyer, sought to invest its working capital exclusively in short-term, investment-grade securities. *Id.* ¶ 186. TAC purchased the DBSI securities based on its understanding that these securities would be highly liquid, safe, short-term debt securities. *Id.* As relevant to its claims in this lawsuit, TAC purchased $20 million of the Pivot Master Trust - Series I securities through Credit Suisse on May 8, 2007. *Id.* ¶ 197. On or about August 1, 2007, TAC purchased $10 million of the Capstan Master Trust - Series 1 securities and $10 million of Capstan Master Trust - Series 2 securities through Credit Suisse. *Id.*

**B.    DBSI's allegedly fraudulent role in its Structured ARS Market**

In order to create the appearance that the securities had sufficient liquidity to be marketed to institutional investors, plaintiff alleges that DBSI manipulated the market by placing support bids in every auction for the securities at issue, as well as for other ARS for which it served as the sole or lead broker-dealer, including the Camber Trust. FAC ¶¶ 31, 94-95, 102. DBSI also placed bids for the full

amount of the issue of the auction. *Id.* ¶¶ 31, 102. Given its conduct supporting the auctions, DBSI knew that auctions would fail in the event that DBSI decided to stop placing bids, which it decided to do in July 2007 and did in August 2007, resulting in the collapse of the market for these securities. *Id.* ¶¶ 95-98, 105.

Plaintiff also alleges that because DBSI was the only broker-dealer which could participate in the auction for the securities held by the Trusts, it had full access to all bids to purchase and orders to sell which permitted it to place bids for its own account so as to influence the outcome of the auction. FAC ¶ 92. This sole access not only allowed DBSI to manipulate the auctions to make it appear as if there were sufficient third-party demand for the ARS, but also allowed DBSI to set the auctions' interest rates lower than they otherwise would have been, so that TAC and other investors earned less interest. *Id.* ¶¶ 4, 113.

Plaintiff asserts that DBSI engaged in this conduct without adequate disclosure to the market. FAC ¶ 111. Plaintiff notes that in May 2006, the Securities and Exchange Commission (SEC) initiated cease-and-desist proceedings against 15 investment banks – not including DBSI – for their conduct with respect to certain ARS auctions. *Id.* ¶ 36; *see also In re Bear, Sterns & Co*, Admin 3-12310, Release Nos. 8684 *et al.* at 5 (SEC 5/31/06), available at www.sec.gov/litigation/admin/2006/33-8684.[6] The SEC found that the investment banks violated Section 17(a)(2) of the Securities Act of 1933 (Securities Act), which prohibits material misstatements and omissions in any offer or sale of securities by "interven[ing] in auctions by bidding for their proprietary accounts or asking customers to make or change orders without adequate disclosures." *In re Bear, Sterns & Co.* at 5-6. The SEC noted that disclosures that broker-dealers "may submit orders in Auctions for [their] own accounts" and that broker-dealers "might have an advantage over other bidders in that [they] would have knowledge of other orders placed through [them] for that Auction" were insufficient. *Id.* Plaintiff argues that the disclosures made by DBSI with respect to the structured ARS at issue here were identically deficient. *See* FAC ¶ 95 (the Private Placement Memoranda (PPM) for the Pivot Master Trust securities states that

[6] The Court will take judicial notice of the 2006 cease-and-desist order as it was referenced in the FAC. *See, e.g.*, FAC ¶ 36; *see also Dreiling v. Am. Express Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006) (taking judicial notice of documents referenced in the complaint, as well as SEC filings which are subject to judicial notice).

broker-dealers "may" submit orders and purchase for their own accounts); *see also* FAC, Appendix A.

**C. Rating Agencies' role in DBSI's Structured ARS Market**

Plaintiff alleges that the Rating Agency defendants hold themselves out to be independent "financial gatekeepers" of Wall Street. FAC ¶ 117. The SEC has identified these agencies as "nationally recognized statistical rating organizations" (NRSROs). *Id.* According to the SEC, the "'single most important criterion' to granting NRSRO status is that 'the rating organization is recognized in the United States as an issuer of credible and reliable ratings by the predominant users of securities ratings." *Id.* ¶ 118. S&P and Fitch allegedly conduct extensive due diligence and independent analysis in order to accurately rate investments and have publicly announced that, "if they believed they had 'inadequate information to provide an informed credit rating to the market, [they] would exercise [their] editorial discretion and [would] either refrain from publishing the opinion or withdraw an outstanding credit rating.'" *Id.* ¶¶ 119-120. The Rating Agencies, however, accept "huge payments from the investment banks in exchange for investment-grade ratings on undeserving instruments. According to numerous published reports and the testimony of high ranking former officers, the credit rating agencies received three to four times the fees for rating a structured finance security than they received for rating a corporate bond. Such fees were collected for 99.5 percent of the securities that the agencies rated." *Id.* ¶ 123.

For structured ARS, like the ones here, plaintiff alleges that the securities could not issue and the credit rating agencies would not get paid unless the Agencies provided a pre-determined AAA rating for the securities. Therefore, an alleged conflict of interest developed such that the Rating Agencies abandoned their independence and relaxed their rating criteria and procedures in order to secure the business of the investment banks in rating these types of securities. *Id.* ¶¶ 124-139.

Plaintiff alleges that, given the highly complex and esoteric nature of the structured ARS being issued by DBSI and similar investment banks, the Rating Agencies knew that institutional investors like TAC would necessarily rely on the ratings. *Id.* ¶¶ 140-143. Nonetheless, plaintiff alleges, "the rating agencies knowingly, or through gross negligence, assigned investment-grade ratings to the vast majority of structured finance securities, including the complex auction rate securities such as those at issue in

this action, without regard to whether the underlying security deserved an investment-grade rating and notwithstanding their knowledge that investors would equate an investment-grade rating with liquidity." *Id*. ¶ 143.

With respect to the DBSI ARS at issue, plaintiff alleges that the Pivot Master Trust and Capstan Master Trust securities underwritten by DBSI were rated by S&P and Fitch. S&P "assigned these securities an AAA rating, its highest, which expresses the conclusion that '[t]he obligor's capacity to meet its financial commitment on the obligation is extremely strong.'" *Id*. ¶ 166. Fitch "also assigned an AAA rating to these securities, which is reserved for those securities 'of the highest credit quality. "AAA" ratings denote the lowest expectation of credit risk. They are assigned only in cases of exceptionally strong capacity for payment of financial commitments. This capacity is highly unlikely to be adversely affected by foreseeable events.'" *Id*. ¶ 166. Plaintiff notes that these ratings were explicitly referenced in the Pivot Master Trust and Capstan Master Trust offering statements, and "these securities could not have been issued unless they received a 'AAA' rating from both Fitch and S&P." *Id*. ¶ 167.

Plaintiff argues that the AAA ratings assigned to the Trusts were false and misleading for at least three independent reasons:

1. The ratings assigned to these securities were based on a statistical analysis of the pool of reference securities that were the subject of the CDS between the SPV and Deutsche Bank AG, where the SPV was not required to make payments on the CDS until a certain percentage of the pool of reference securities suffered a "credit event." This percentage is referred to as the "attachment point." *Id*. ¶ 169. Plaintiff alleges that although not disclosed in the offering documents, DBSI "has subsequently represented that the attachment point was 7.8 percent in the case of the Pivot Master Trust securities and 9.75 percent in the case of Capstan Master Trust securities." *Id*. Plaintiff contends that under two "accepted industry statistical practices, and published default rates for the portfolio of reference securities subject to the CDS," the attachment points should have been significantly higher in order for the Trusts to warrant the AAA ratings they received from S&P and Fitch. *Id*. ¶ 170.

2. S&P failed to follow its "weak-link" ratings approach – where the credit rating assigned to a structured finance product can only be as high as the weakest link in the structured finance payment

chain – because part of the interest on the securities was dependent on a series of "basis swaps" that were entered into with Deutsche Bank AG as swap counter-party. As such, the creditworthiness of the structured ARS at issue was "directly dependent on the creditworthiness of Deutsche Bank AG" which at the time was only AA-, and not AAA as required by the Trusts' offering statements. *Id*. ¶¶ 171-172.

3. The ratings assigned to the securities were false and misleading because S&P and Fitch knew that investors – including TAC – understood the AAA ratings to be a representation about the ready liquidity of these securities and the Rating Agencies were reckless or negligent in failing to learn that DBSI was artificially creating the market for the securities through its auction conduct and the market for the securities could not exist otherwise. *Id*. ¶¶ 174-175.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 544, 555.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the court must assume that the plaintiff's allegations are true and must draw all reasonable inferences in the plaintiff's favor. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig*., 536 F.3d 1049, 1055 (9th Cir. 2008). If the court dismisses the complaint, it must decide whether to grant leave to amend. The Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000) (quotation marks and citations

omitted).

## DISCUSSION

### 1. DBSI's motion to dismiss

#### A. Exchange Act market manipulation claim

Section 10(b) market manipulation claims, as other claims under the Exchange Act, must be pled with "exacting" particularity. *Zucco Partners, LLC v. Digimarc Corp*., 552 F.3d 981, 990 (9th Cir. 2009). DBSI argues that plaintiff's market manipulation claim is fatally deficient as TAC has failed to adequately allege: manipulative conduct by DBSI; justifiable reliance on the assumption of an efficient market free of manipulation; a strong inference of scienter on the part of DBSI; or loss causation. The Court will address each contention in turn.

##### i. Manipulative conduct

Plaintiff argues that the alleged act which underlies its claim is the "communication of false information into the marketplace concerning the demand or value of a security." Oppo. at 11. Because market manipulation claims "can involve facts solely within the defendant's knowledge[...,] at the early stages of litigation, the plaintiff need not plead manipulation to the same degree of specificity as a plain misrepresentation claim." *ATSI Communs., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007). Instead, a "manipulation complaint must plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." *Id*. Here, plaintiff does not rest on this somewhat relaxed burden, but instead identifies DBSI's scheme and facts that underlie it with particularity.

Plaintiff alleges that DBSI's scheme to affect the market was carried out by placing support bids in every auction for the securities and for the full amount of the issue each time. FAC ¶ 102; Oppo. at 12. It was this conduct, plaintiff pleads, that created and falsely sustained the market for the structured ARS. *Id*. ¶ 98. This conduct made the securities appear liquid, when they were not, and thereby artificially inflated the prices for the securities. *Id*. ¶¶ 91, 103. DBSI's conduct also depressed the interest rates for the securities. *Id*. ¶ 112. Had DBSI not placed support bids in every auction for 100% of the issue, plaintiff alleges that auctions would have failed and the market collapsed, *id*. ¶¶ 98, 105,

which is what happened in August 2007 when DBSI stopped its practices. *Id.* ¶ 105. Plaintiff also alleges that DBSI had no legitimate interest in owning those securities, but was motivated by the desire to earn millions of dollars in underwriting fees and gain credit protection for Deutsche Bank AG. *Id.* ¶ 104. Finally, plaintiff identifies the date of each of the auctions in which DBSI engaged in manipulative bidding. *Id.*, Appendix B. The Court finds that these specific allegations are sufficient to meet Rule 9(b)'s heightened pleading requirements, as they "specify what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue." *Baxter v. A.R. Baron & Co.*, 1995 U.S. Dist. LEXIS 14882, *22 (S.D.N.Y. Oct. 6, 1995).[7]

Nevertheless, DBSI contends that its alleged acts cannot be considered "manipulation" under the Exchange Act. DBSI Motion to Dismiss (MTD) at 25. The DBSI's primary argument is that in the offering documents, the PPMs, for the securities at issue DBSI effectively disclosed the possibility that DBSI would engage in the conduct that plaintiff claims is manipulative. Disclosed conduct, DBSI argues, cannot form the basis of a market manipulation claim. *Id.* at 25-26; DBSI Reply MTD at 2-6; *see also In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378, 390 (S.D.N.Y. 2010) ("The market is not misled when a transaction's terms are fully disclosed.").[8] Specifically, the PPMs disclosed that:

Holders of the Certificates may not be able to sell some or all of their Certificates at an Auction

---

[7] TAC's allegations are not the type of generalized market misconduct allegations that have been rejected by the cases DBSI relies on. *See In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 304 (S.D.N.Y. 2009) (plaintiff did not allege defendant participated in each auction for full amount of securities and did not "include specific allegations as to which Defendants performed what manipulative acts at what times and with what effect."); *Baxter*, 1995 U.S. Dist. LEXIS 14882, *22-23 (plaintiffs failed to specify how each defendant participated in the alleged scheme or how the plaintiffs were injured with respect to the transactions); *Connolly v. Havens*, 763 F. Supp. 6, 13 (S.D.N.Y. 1991) (allegations which fail to specify what fraudulent acts were performed, when they were performed, the number or percentage of shares acquired, and the connection between the fraudulent acts and plaintiffs' injuries insufficient to state a claim); *cf. Scone Invs., L.P. v. American Third Mkt. Corp.*, 1998 U.S. Dist. LEXIS 5903 (S.D.N.Y. Apr. 27, 1998) (plaintiffs adequately alleged market manipulation, but not reliance on integrity of market).

[8] In its motion to dismiss, DBSI contends, without citation to authority, that only "washed sales," "matched orders," or "rigged prices" can constitute market manipulation. DBSI MTD at 25. In Reply, DBSI does not respond to plaintiff's persuasive authority that Section 10(b) encompasses additional manipulative conduct like that alleged here. *See* Oppo. to DBSI MTD at 15. In any event, the Court rejects DBSI's unduly narrow interpretation of market manipulation.

**United States District Court**
For the Northern District of California

> if the Auction fails.
>
> The Broker-Dealer may assist in resales of the Certificates, but it is not required to do so. A secondary market for the Certificates may not develop. If a secondary market does develop, it might not continue or it might not be sufficiently liquid to allow resale of the Certificates.
>
> The Broker-Dealer may submit Orders in auctions for its own account. … [if] the Broker-Dealer submits an Order for its own account in any Auction, it could have an advantage over other Potential or Existing Holders in that it would have knowledge of other Orders placed through it in that Auction.
>
> Broker-Dealers may submit Orders and purchase certificates [sic] for their own account, either in an Auction or otherwise.

DBSI MTD at 6.[9] According to DBSI, these disclosures put participants in the market on notice that auctions may fail, and more importantly, that DBSI would have advantages over other holders and may in fact bid in the auctions for its own accounts – the essence of the manipulative conduct asserted by plaintiff. Similar disclosures, DBSI argues, have led courts to reject the argument being made by TAC here.

In particular, DBSI relies on *In re UBS Auction Rate Secs. Litig*., 2010 U.S. Dist. LEXIS 59024 (S.D.N.Y. June 10, 2010), where the Court held that allegations that defendants placed support bids in every auction were insufficient to establish manipulation where the defendants disclosed in the offering documents that the broker-dealers "may" maintain a secondary trading market in ARS outside of the auctions and that the broker-dealers "may" also hold ARS for its own account and participate in the auctions. *Id*. at * 23-33. The Court found that the offering documents disclosed "that the ARS market was not necessarily set by the 'natural interplay of supply and demand,' but that it could be influenced by broker-dealers.'" *Id*. at 56. The Court concluded that "[p]laintiffs were not led to believe one thing when another was true, [so] a reasonable jury could not find that Defendants' alleged conduct was deceptive." *Id*. at 58-59.

This case differs from *USB* in at least one material respect: Here, plaintiff alleges not only that

---

[9] Capstan PPM at 11, 20; Pivot PPM at 9, 11, 12; Camber PPM at 9, 11, 12. *See* Frohlich Declaration [Docket No. 123], Exs. 1-3. As the PPMs are referenced in the FAC and no party disputes their authenticity, the Court will take judicial notice of them. *See United States v. Ritchie,* 342 F.3d 903, 908 (9th Cir. 2003).

DBSI participated in every auction but also bid for 100% of the issue at each auction.[10] More fundamentally, this Court cannot say that the acts alleged here – bidding in every auction for 100% of the issue – were actually disclosed by PPMs. A reasonable juror could certainly find that representing that DBSI "may" participate in the auctions does not disclose that DBSI "will" participate, much less that DBSI "will always" participate. Fundamentally, the allegations in this case are that DBSI created a false market for these securities; that the seeming liquidity of the securities existed only because of DBSI's extensive intervention in the market. The disclosure that DBSI "may" participate in the market is simply not sufficient to disclose that – as alleged – DBSI created a false market. *See Defer LP v. Raymond James Fin., Inc.*, 2010 U.S. Dist. LEXIS 91856, *38-39 (S.D.N.Y. Sept. 2, 2010) (disclosure that defendant may "routinely" place ARS orders for its own account not sufficient to "disclose the risk that is at the [complaint's] core - that the ARS were liquid only because of extensive and sustained auction broker intervention."); *see also In re Credit Suisse First Boston Corp. Sec. Litig.*, 1998 U.S. Dist. LEXIS 16560, 21-22 (S.D.N.Y. Oct. 19, 1998) (blanket disclaimer that defendants "may from time to time have long or short positions" was not enough to protect the defendants from liability as a matter of law where plaintiff alleged defendants' knowledge and pattern of their short positions was part of defendants' plan to drive down price of stocks); *cf. Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008) (alleged disclaimer "speaks entirely of as-yet-unrealized risks and contingencies. Nothing alerts the reader that some of these risks may already have come to fruition.").

DBSI's other cases are likewise inapposite. In *In re Merrill Lynch Auction Rate Sec. Litig.*, 704 F. Supp. 2d 378 (S.D.N.Y. 2010), the Court dismissed a market manipulation claim where defendants disclosed not just that defendants "may" participate in ARS auctions but that they "routinely" did. The Court does not find this case persuasive here, because the disclosures made by Merrill Lynch about its role in ARS auctions – not only in its PPMs but also on its website – were significantly different from

[10] The *USB* Court also found, assuming *arguendo* that the acts alleged were in fact manipulative, that plaintiffs' complaint suffered from other defects including a failure to set forth when the manipulative acts were performed and what effect the scheme had on the market for the securities at issue, and failed to connect their allegations with any specifically identified ARS issued by defendants. *Id*. at *60-62. The FAC here does not suffer from the same defects.

the limited disclosures made in DBSI's PPMs.[11] *See also Bondar v. Bank of Am. Corp. (In re Bank of Am. Corp. Auction Rate Secs. (ARS) Mktg. Litig.)*, 2011 U.S. Dist. LEXIS 18208 (N.D. Cal. Feb. 24, 2011) (dismissing ARS market manipulation claims based on support bid conduct, where defendant disclosed on its website and in other materials that it "routinely" submits bids "even after obtaining knowledge of some or all of the other orders submitted."); *In re Merrill Lynch Auction Rate Secs. Litig.*, 2011 U.S. Dist. LEXIS 14053, *7-9, *17-29 (S.D.N.Y. Feb. 9, 2011) (dismissing ARS market manipulation claims based support bid conduct where – following SEC's May 2006 Cease and Desist Order under which Merrill Lynch was assessed a significant penalty for its undisclosed auction bidding conduct – Merrill Lynch disclosed on its website that it "may routinely" place bids in auctions for its own account or "to prevent an auction failure" or to avoid an "auction clearing rate that Merrill Lynch believes does not reflect the market for the securities," and that "[t]here may not always be enough bidders to prevent an auction from failing in the absence of Merrill Lynch bidding in the auction."); *but see In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d 294, 304 (S.D.N.Y. 2009) (noting defendant's disclosures informed investors that defendant "routinely" participated in auctions in order to avoid a failed auction and to set a specific clearing rate; court dismissed manipulation claim not due to disclosures but because plaintiffs failed "to include specific allegations as to which Defendants performed what manipulative acts at what times and with what effect").[12]

Finally, both sides rely, for different purposes, on a 2006 cease-and-desist order issued by the SEC against 15 investment banks involved in the traditional ARS market. *See* FAC ¶ 36 & DBSI MTD at 3, n.1. In that order the SEC found that certain banks "intervened in auctions by bidding for their proprietary accounts . . . without adequate disclosures." SEC Order at 6. DBSI relies on the 2006 Order to argue that the SEC's order regarding other companies' conduct in the traditional ARS market should

---

[11] The Second Circuit, in addressing the appeal from the district court's dismissal of the market manipulation claim in *In re Merrill Lynch Auction Rate Sec. Litig*. 704 F. Supp. 2d 378 (S.D.N.Y. 2010), asked the SEC to submit its views on whether Merrill Lynch's disclosures that it "routinely" placed support bids precluded plaintiffs' market manipulation claim and/or plaintiffs' ability to plead justifiable reliance on an the assumption of the ARS market's integrity. *See* Docket No. 218 at 4-5.

[12] The Court will not rely as precedent, or distinguish, *Teva Pharmaceuticals Industries v. Deutche Bank AG*, No. 09-CV-6205 (S.D.N.Y. July 10, 2009), as the Court there did not address the full scope of arguments made here and did not issue a written opinion.

have put potential investors in the securities at issue here on notice that DBSI could be engaged in similar conduct. DBSI MTD at 3-5, 24-25. The Court, however, is not persuaded that the SEC order – which was not against DBSI and which did not address structured ARS similar to the ones at issue here – could as a matter of law disclose DBSI's alleged manipulative conduct. *Cf. Dow Corning Corp. v. BB&T Corp.*, 2010 U.S. Dist. LEXIS 124031 (D.N.J. Nov. 23, 2010) (fact that news articles, 2006 SEC Order, and prospectuses for ARS holdings "publicized the risk that auctions might fail and the practice of brokers to submit support bids to prevent auction failures" did not defeat claim where plaintiffs alleged broker-dealers were "using a crescendo of support bids to prop up an illiquid market").

Plaintiff argues that the SEC's conclusion in the order – that disclosures that broker-dealers "may" participate in the auctions when, in fact, they are certain to do so is materially misleading as a matter of law – should apply in this case. Oppo. to DBSI MTD at 17-18. DBSI disputes that the SEC actually reached this conclusion and argues that even if the SEC's order stands for the proposition plaintiff asserts, it was the product of a settlement, and, therefore, does not have the force of law. Reply at 3-4. The Court need not resolve this dispute at this juncture. The Court has concluded that plaintiff has adequately pled acts of market manipulation. Therefore what, if any, import should be given to the 2006 Order is a dispute for a later date.

**ii. Justifiable reliance**

In a market manipulation case, plaintiff must allege "reliance on an assumption of an efficient market free of manipulation." *ATSI Communs., Inc.*, 493 F.3d at 101. DBSI argues that plaintiff cannot meet that pleading standard because plaintiff – a highly sophisticated investor which should have been aware of the SEC's 2006 cease-and-desist order – should have known that the ARS market was not an efficient one, but one subject to "inefficiencies" caused by the participation of broker-dealers like DBSI in the auctions. DBSI Reply MTD 6-8. DBSI relies primarily on the *USB* decision discussed above. There, the Court found that plaintiffs could not state they justifiably relied on an efficient market because the disclosure in defendants' prospectuses that defendants "may" participate it the market and that such participation may affect auction clearing rates, as well as the SEC cease-and-desist order and related news stories, put the market on notice that the market was not efficient. *In re UBS Auction Rate*

*Secs. Litig.*, 2010 U.S. Dist. LEXIS 59024 at *72-75.

As noted above, the issue of whether the PPMs for the Pivot and Capstan Trusts disclosed, or adequately disclosed, the alleged manipulation is not one about which reasonable minds cannot differ and, therefore, cannot be decided on this motion.[13] Moreover, the 2006 SEC order instructing the investments banks that they could continue to place prop bids in ARS auctions as long as they "adequately" disclosed their practice does not foreclose TAC's allegation of reasonable reliance for several reasons. There is no indication that the ARS subject to the 2006 SEC order operated in the same manner as the esoteric, structured ARS at issue here, and the SEC's order did not mention or address the conduct of DBSI. Further, even if a connection between the 2006 Order and the ARS at issue here could be drawn, plaintiff and other QIBs could reasonably have relied on the fact that post the 2006 Order, broker-dealers were required to "adequately disclose" the exact nature of their involvement in the auctions. That DBSI continued to use trivializing disclosures, such as that DBSI "may" participate in the auctions, could lead reasonable investors to conclude that any role DBSI played in the auctions was not significant enough to affect the efficient nature of that market.[14] While the Court is not deciding whether DBSI's disclosures were or were not sufficient – such a decision is for the jury – the Court finds that this issue is not appropriate for resolution on this motion to dismiss.

Finally, TAC also alleges that it was reasonable for it to rely on the appearance of an efficient

---

[13] For this reason, the Court disagrees with the recent decision *Pivot Point Capital Master LP v. Deutsche Bank AG*, Case No. 08-2788 (AKH) (S.D.N.Y. Dec. 9, 2010) where the Court found that the Capstan PPM disclosed "all the material facts" regarding DBSI's role in auction process. *Id.* at 9-10. The Court also notes that the *Pivot Point* Court found an absence of reasonable reliance by focusing on the inherent but *disclosed* risk in the "reference" securities that formed the basis of the CDS, as 20% of the reference securities were backed by subprime mortgages. *Id.* at 9. Based on the allegations in this case, however, the question of reasonable reliance turns on whether the PPMs disclosed that DBSI created a false market for the securities through its significant involvement in propping up the auctions. If it turns out that the failure of the auctions was caused by a genuine lack of third-party interest given the state of the subprime mortgage market or looming credit crisis and not due in part or in whole to DBSI's conduct in creating a false market – or if the evidence establishes that DBSI did not create a false market – that can be argued on summary judgment or at trial.

[14] In *UBS*, another fact that undermined plaintiffs' allegation of reasonable reliance was that at least a portion of the claims at issue were for ARS purchased after the initial "wave of auction failures that occurred in August 2007, as a result of the decision by a number of broker-dealers not to intervene to prevent auction failures for certain particularly risky ARS." *In re UBS Auction Rate Secs. Litig.*, 2010 U.S. Dist. LEXIS 59024, *74. That initial "wave" was the one, plaintiff alleges, that wiped out its investments in this case.

United States District Court
For the Northern District of California

market (and the related liquidity) for these particular structured ARS because TAC had previously purchased structured ARS from DBSI through the Camber Trust. FAC ¶¶ 106, 195. As none of the Camber Trusts auctions failed (since, unbeknownst to TAC, they were propped up by DBSI), TAC argues, it was further reasonable for it to rely on an assumption of an efficient market.

These particularized allegations are sufficient to survive the motion to dismiss.

**iii. Scienter**

"[T]o adequately plead scienter, the complaint must [] 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Zucco Partners*, 552 F.3d at 991. The inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Inc.*, 551 U.S. 308, 322-23 (2007) (emphasis in original).

DBSI challenges plaintiff's scienter allegations by arguing that, at base, plaintiff's only scienter allegation is that the sole purpose of DBSI's scheme was to earn millions of dollars in underwriting fees. DBSI Reply MTD at 9-10.[15] DBSI relies on a number of cases which have held that allegations that defendant was motivated by profit, particularly the desire to obtain fees from underwriting and auctions, are insufficient to demonstrate scienter. *See, e.g., In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d at 305 (allegations that defendant continued underwriting and auctioning ARS to "offset subprime market losses and to obtain fees for services in connection with the auctions [] are insufficient to give rise to a strong inference of scienter."); *Defer LP v. Raymond James Fin., Inc.*, 654 F. Supp. 2d 204, 217 (S.D.N.Y. 2009) (allegations that defendants sought to perpetuate the artificial ARS market "so that they could earn substantial sales commissions and fees for underwriting the securities and managing ARS auctions" insufficient to allege scienter).

Plaintiff initially notes that other courts *have* found that a desire to earn lucrative fees is

---

[15] DBSI opposes any use of DBSI's regulatory settlements with the New York Attorney General and the SEC as a basis for supporting an inference of scienter. DBSI MTD at 14-15. In Opposition, TAC clarified that it does not base its scienter allegations on those settlements. Oppo. to DBSI MTD at 22.

sufficient to allege scienter. *See, e.g., Abu Dhabi Commer. Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 179-180 (S.D.N.Y. 2009); *see also* Oppo. to DBSI MTD at. 22 n.29 (citing cases). However, plaintiff argues that the aim of the scheme here was not only to allow DBSI to earn millions of dollars in fees but *also* to provide insurance against losses to Deutsche Bank AG's portfolio. FAC ¶ 84, 219. That is a significant difference between the traditional ARS at issue in the cases DBSI relies on and the case here. TAC's tracking of the complex transactions connecting the structured ARS at issue with "insurance" protection to Deutsche Bank AG, is particularized and not the sort of generalized allegation of participation in ARS in order to cover "other" losses that have been rejected by other courts. *See, e.g., In re Citigroup Auction Rate Sec. Litig.*, 700 F. Supp. 2d at 305.

The nature of the structured ARS at issue here also supports plaintiff's assertion that DBSI's participation in the market – placing bids in 100% of the auctions for 100% of the issue – cannot be explained by any "legitimate" investment aim on DBSI's part. Plaintiff alleges that DBSI provided itself protection from the market it created and sustained by allowing itself to "unwind" any securities it held in its own account and "exchange those holdings for the unimpaired and liquid collateral supporting the CDS." FAC ¶ 104. The ability to unwind its own investments in the structured ARS supports plaintiff's allegation that DBSI had no legitimate interest in holding securities for its own account. In sum, whether considered individually or collectively, plaintiff's allegations support a strong inference of scienter.

**iv. Loss Causation**

DBSI attempts to avoid TAC's specific allegations of loss causation by arguing that plaintiff's losses are really due to the global credit crisis that began in the summer of 2007. DBSI MTD at 20-22; DBSI Reply MTD at 10-11. As plaintiff alleges, however, DBSI artificially manipulated the market and without that manipulation, there would not have been sufficient interest in buying what turned out to be long-term investments at short-term rates. Oppo. at 25. Allegations that there *never* was sufficient investor demand for the DBSI securities, is sufficient to allege loss causation here. *See also In re Initial Pub. Offering Sec. Litig.*, 297 F. Supp. 2d 668, 674 (S.D.N.Y. 2003) (finding that allegations of price inflation caused by market manipulation can establish loss causation). Moreover, even if the collapse

United States District Court
For the Northern District of California

in the global credit crisis caused some part of TAC's losses, in the Ninth Circuit, plaintiff is not required to show that defendant's conduct "was the sole reason for the investment's decline in value" in order to show loss causation. *In re Daou Sys.*, 411 F.3d at 1025. Finally, TAC also specifically alleges that because of DBSI's fraudulent conduct, TAC purchased the securities at inflated prices and received less in periodic interest payments. FAC ¶¶ 91, 103. Plaintiff, therefore, has sufficiently alleged loss causation.

**B. Exchange Act material omissions claims**

TAC also asserts a 10(b) claim under Rule 10b-5(b) based on DBSI's material omissions. Oppo. to DBSI MTD at 26-30. TAC bases its "omissions" claim on much of the same conduct that underlies its market manipulation claims. *Id*. at 26-27. In light of the Court's rulings on scienter and loss causation with respect to the market manipulation claim – which would apply similarly to the omissions claim – the only remaining question is whether plaintiff has adequately alleged reliance, and specifically whether plaintiff can benefit from the "presumption of reliance" recognized in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972).[16]

DBSI argues that, based upon the totality of the allegations in the FAC, which allege omissions but also misrepresentation and market manipulation, plaintiff cannot establish an omissions case under *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931 (9th Cir. 2009). There, the Ninth Circuit held that omissions claims under 10b-5(b) must be distinct from manipulation claims under 10b5-(a) and (c). The Court recognized that since, "'[a]ny fraudulent scheme requires some degree of concealment, both of the truth and of the scheme itself. We cannot allow the mere fact of this concealment to transform the alleged malfeasance into an omission rather than an affirmative act. To do otherwise would permit the *Affiliated Ute* presumption to swallow the reliance requirement almost completely.'" *Id*. at 941 (quoting *Joseph v. Wiles*, 223 F.3d 1155, 1163 (10th Cir. 2000)). As such, the Ninth Circuit held that the *Affiliated Ute* presumption of reliance is not available in a case of mixed secret manipulation and

[16] As DBSI points out, and plaintiff did not contest during the oral argument, because plaintiff has not alleged reliance on the PPMs, it cannot allege direct reliance on a representation which omitted material facts. DBSI Reply MTD at 12.

omission claims. *Id*.

TAC attempts to distinguish *Desai* by arguing that here the market manipulation claim under Rule 10b-5(a) and (c) is based on different conduct than the omissions claim under Rule 10b-5(b): the former is based on DBSI's bidding for the full issue in every auction without any legitimate investment interest, while the latter is based on the PPMs' faulty and inadequate disclosure of DBSI's conduct in market. DBSI Reply MTD at 29, n.39.

However, all such conduct was part of the same alleged scheme to manipulate the market for the structured ARS. As such, under *Desai*, plaintiff cannot rely on the *Affiliate Ute* presumption, and plaintiff has failed to allege direct reliance. DBSI's motion to dismiss is GRANTED with respect to plaintiff's omissions claim without leave to amend.[17]

**C. California Corporations Code claims**

DBSI initially argues that plaintiff lacks standing to sue under the California Corporations Code because neither TAC nor DBSI is a California corporation and the only alleged connection to California is that TAC's broker purchased the structured ARS from its California office. However, the Court finds – consistent with its finding in denying DBSI's motion to transfer venue – that TAC's "injuries were caused at least in part by conduct within California." April 13, 2010 Order at 6. As such, plaintiff has standing to pursue these claims.[18]

**i. Privity**

DBSI argues that TAC's claim under California Corporation Code 25501 (which is based on Corporation Code section 25401 for selling securities using untrue statements or omitting material facts), must be dismissed for lack of privity because TAC's purchases were made by Credit Suisse and

---

[17] At the oral argument, plaintiff admitted that no additional allegations could be made to support the omissions claim.

[18] The Court recognizes that a different conclusion was reached in *In re Merrill Lynch Auction Rate Secs. Litig.*, 2011 U.S. Dist. LEXIS 14053, *31-32 (S.D.N.Y. Feb. 9, 2011). Here, unlike the cases relied on by the Court in the *Merrill Lynch* opinion, there is conduct in California that resulted in the alleged harm to plaintiff. The ARS at issue were purchased in California by plaintiff's agent. That conduct is sufficient to allow plaintiff to bring claims under California's Corporation Code.

not plaintiff. Claims under California Corporations Code section 25501 do require privity between the plaintiff and defendant, but privity is adequately alleged here. Plaintiff purchased the securities from the defendant, DBSI, and seeks to hold DBSI liable for its conduct. The fact that TAC's agent, Credit Suisse, made the purchases on TAC's behalf does not alter the existence of privity. *See, e.g., Apollo Capital Fund LLC v. Roth Capital Partners, LLC*, 158 Cal. App. 4th 226, 253 (Cal. App. 2007).[19]

**ii. Scienter**

DBSI argues that plaintiff's claim under Section 25500 (which is based on Section 25400 for manipulating the market), must be dismissed because plaintiff has failed to allege the "high level" of scienter required for this claim. *See, e.g., California Amplifier, Inc. v. RLI Ins. Co.*, 94 Cal. App. 4th 102, 112 (Cal. App. 2001) ("the purpose and intent of the willful participation requirement is to clarify and underscore the high level of scienter required for a violation of section 25500."). However, based on the discussion of scienter under Section 10(b), the Court concludes that TAC has adequately pled scienter for purposes of Corporations Code section 25500.

**D. Statute of limitations**

DBSI asserts that plaintiff's Exchange Act and Corporations Code claims are barred by the applicable two year statutes of limitations. *See* 28 U.S.C. § 1658(b); Cal. Corp. Code § 25506(b). For both sets of claims, the statutes of limitations begin to run on inquiry notice. *See Merck & Co. v. Reynolds*, 130 S. Ct. 1784, 1798 (2010); *Deveny v. Entropin, Inc*., 139 Cal. App. 4th 408, 423 (Cal. App. 2006). DBSI argues that plaintiff's claims should be dismissed because by 2006, when the SEC issued the cease-and-desist order discussed above, TAC should have been on reasonable notice that the ARS auctions might fail, that an efficient ARS market might not exist, and that DBSI might participate in the

[19] The cases cited by DBSI are not to the contrary. *See Apollo Capital Fund LLC,* 158 Cal. App. 4th at 253 (plaintiff could not sue placement agent who sold the securities for the corporation because of lack of privity); *SEC v. Seaboard Corp*., 677 F.2d 1289 (9th Cir. 1982) (attorney who worked for corporation could not be held liable as "seller" of securities); *City of Alameda v. Nuveen Mun. High Income Opportunity Fund*, 2009 U.S. Dist. LEXIS 42637 (N.D. Cal. May 20, 2009) (dismissing Section 25501 claim against city for lack of privity where municipal revenue bond anticipation notes were underwritten and sold by a third-party, not the city).

United States District Court
For the Northern District of California

ARS auctions for its own account. Plaintiff responds that the "truth" about the structured ARS market at issue did not start to emerge until the auctions failed in August 2007 and came fully to light in August 2008 when regulators publicized the findings of their investigations into DBSI's practices. FAC ¶¶ 9, 114-115.

DBSI's arguments on the statute of limitations are essentially the same as the ones made in its attempt to argue that the market manipulation had been disclosed and TAC could not allege reasonable reliance. *See supra*. For the same reasons that the Court found that TAC has sufficiently plead non-disclosed manipulative acts and reasonable reliance, the Court finds that at this stage of the litigation plaintiff has adequately alleged that it did not have notice of DBSI's conduct sufficient to trigger the statutes of limitations.

**E. Common law fraud**

Both parties agree that the elements of a California common law fraud claim are similar to the elements of a Section 10(b) claim. DBSI MTD at 31-32; Oppo. DBSI MTD at 34-35. DBSI contends that TAC has failed to allege "justifiable reliance" sufficient to withstand a motion to dismiss. DBSI Reply MTD at 15. For the same reasons that the Court found TAC has sufficiently plead reasonable reliance under Rule 10(b), the Court finds that TAC has plead justifiable reliance for its common law fraud claim.

**F. Punitive damages**

Finally, DBSI moves to dismiss plaintiff's claim for punitive damages on the grounds that (1) punitive damages are not available under the federal securities law, and (2) plaintiff has failed to adequately plead elements of common law fraud, particularly justifiable reliance, so the claim for punitive damages under that cause of action cannot survive. As discussed above, the Court finds that TAC has adequately alleged a common law fraud cause of action. As punitive damages are available under that claim, DBSI's motion to dismiss on this ground is DENIED.

**2. DBSI's motion to strike**

DBSI moves to strike portions of the FAC that refer to various investigations conducted by the New York Attorney General (NYAG) and the SEC, and the resulting settlement agreements. DBSI Notice of Motion to Strike (MTS) at 1-3. Federal Rule of Civil Procedure 12(f) provides that a court may, on its own or upon a motion, "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." The function of a Rule 12(f) motion to strike is to avoid the expenditure of time and money that arises from litigating spurious issues by dispensing of those issues before trial. *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993), rev'd on other grounds, 510 U.S. 517 (1994). Motions to strike are generally disfavored. *Rosales v. Citibank*, 133 F. Supp. 2d 1177, 1180 (N.D. Cal. 2001). In most cases, a motion to strike should not be granted unless "the matter to be stricken clearly could have no possible bearing on the subject of the litigation." *Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004).

DBSI argues that the references to the NYAG and SEC investigations and resulting settlements should be stricken because these regulatory settlements cannot support plaintiff's allegations of scienter under Section 10(b). DBSI also argues that "the agreements were the result of private bargaining without any adjudication on the merits – no hearing or trial ever took place and no ruling or other form of decision was ever rendered. Because these regulatory settlements are irrelevant and inadmissible, they cannot have any 'essential or important relationship to the claim for relief' nor can they be 'necessary[] to the issues in question.'" Motion at 3 (quoting *Fantasy, Inc.*, 984 F. 2d at 1527).

Both plaintiff and DBSI rely on *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736 (9th Cir. 2008). In *Glazer*, the Ninth Circuit looked to an SEC cease-and-desist order that had been imposed pursuant to a regulatory settlement in order to find that plaintiffs had adequately alleged falsity under Rule 10b-5. *Id*. at 742. However, the Court found that the cease-and-desist order "was not probative" of scienter, as "the admissions in these settlement agreements were largely legal conclusions, rather than particularized facts giving rise to a strong inference of scienter," and "more importantly" the settlement documents did not support the conclusion that the defendant CEO had actual knowledge of the violations. *Id*. at 748-49.

Here, TAC does not rely on DBSI's regulatory settlements with the NYAG or the SEC as

support for its scienter allegations. Opposition to Motion to Strike at 5, fn.2. Further, the Ninth Circuit's discussion of the SEC cease-and-desist order in *Glazer* does not suggest that such settlements can never be relevant to scienter or other aspects of a Section 10(b) claim. Instead, in *Glazer* the Court found that reliance on the SEC order was simply "not sufficient" to infer scienter in that case. *Id*.

Here, the regulatory investigations and settlements may be relevant to issues in this case, for example, to the issue of notice sufficient to trigger the statute of limitations. As it cannot be said that the regulatory settlements and related documents "have no possible bearing on the subject of the litigation," *Platte Anchor Bolt, Inc.*, 352 F. Supp. 2d at 1057, DBSI's motion to strike is denied.[20]

**3. Rating Agencies' motion to dismiss**

The Rating Agencies move to dismiss plaintiff's common law negligent misrepresentation claims, asserting a number reasons why their conduct is immune from liability. Each of the arguments is addressed in turn.

**A. Choice of law**

As an initial matter, the Court must decide whether New York or California law governs the negligent misrepresentation claims. The Rating Agencies – hoping to benefit from New York's Martin Act, which may preempt common law negligent misrepresentation claims – argue that New York law should apply to this case because the Rating Agencies are located in and disseminate their ratings information from New York. Plaintiff counters that California law should apply given California's significant interests in having its laws applied to the conduct at issue, which occurred in California when Credit Suisse purchased DBSI's securities on TAC's behalf.

[20] The Court is not ruling that information about and documents from the regulatory investigations and settlements are admissible or may otherwise be relied on in support of any future motions. The propriety of any future use of these materials must be determined in the context of the specific issue before the Court. *See, e.g., Kramas v. Security Gas & Oil, Inc*., 672 F.2d 766, 772 (9th Cir. Cal. 1982) (affirming trial court's refusal to admit evidence of a consent decree entered in a prior SEC enforcement proceeding); *see also Option Resource Group v. Chambers Dev. Co.*, 967 F. Supp. 846 (W.D. Pa. 1996) (granting motion in limine to exclude references to SEC consent and final judgment; but denying motion in limine to exclude references to factual findings made in SEC administrative orders).

"In a federal question action that involves supplemental jurisdiction over state law claims, we apply the choice of law rules of the forum state – here, California." *Paulsen v. CNF Inc*., 559 F.3d 1061, 1080 (9th Cir. 2009). California courts employ a "governmental interest analysis" to assess whether California law or non-forum law should apply. *Id*. The governmental interest test requires a three-step analysis. *Coufal Abogados v. AT&T, Inc*., 223 F.3d 932, 934 (9th Cir. 2000). First, the Court examines the substantive law of each jurisdiction to determine whether the laws differ as applied to the relevant transaction. *Id*. Second, "if the laws do differ, the court must determine whether a 'true conflict' exists in that each of the relevant jurisdictions has an interest in having its law applied." *Id*. Third, if a true conflict exists, the Court must determine which forum's law would be most impaired if its laws were not applied. *Id*.

Both sides admit that the first two prongs of the test are met. California and New York's laws are substantively different in terms of the elements of a negligent misrepresentation claim, and those differences create a "true conflict." *Compare* Agencies' MTD at 11-2 *with* Oppo. to Agencies' MTD at 14-15. With respect to the third prong, the Rating Agencies assert that New York's interests would be more impaired if California's law were applied to the negligent misrepresentation claims because they are New York-based entities who provide information about a securities market "centered" in New York. These entities expect New York law to apply to their conduct and as a result, "'consciously attempt to mold their conduct to legal norms, with the expectation that the legal consequences of their conduct will be predictable' and, as such, '[t]heir justified expectation that their conduct will be judged by the rules of jurisdictions in which they carry on their activities merits protection.'" Agencies' MTD at 13 (quoting *Davis v. Costa-Gavras*, 580 F. Supp. 1082, 1092 (S.D.N.Y. 1984)). The Rating Agencies also argue that New York law has consistently acted to protect the free flow of information – "particularly financial information" like that provided by the Agencies – by tailoring special laws and protections for entities publishing information and opinions. Agencies' MTD at 12.

However, while the Rating Agencies operate out of New York, the information they publish is intended to reach and reaches throughout the United States. The Agencies cannot have a reasonable expectation that potential liability for their conduct will be determined solely under the laws of New York. More importantly, California also has a history of adopting, as well as tailoring, legal standards

United States District Court
For the Northern District of California

to safeguard the free flow of information. *See, e.g.*, Cal. Code Civ. Proc. § 425.16 *et seq*. (California's anti-SLAPP statute); Cal. Const., art. I, § 2, subd. (b), and Evid. Code, § 1070 (California's reporter shield privilege). California has a strong interest both in deterring misconduct with respect to commercial speech, *see, e.g., Kasky v. Nike, Inc.*, 27 Cal. 4th 939 (2002), and in the lawful sale of securities in California. *See, e.g., Hall v. Superior Court*, 150 Cal. App. 3d 411, 417 (Cal. App. 1983) ("California's policy is to protect the public from fraud and deception in securities transactions.").[21]

In sum, California has a significant interest in having its law applied to this case and that interest would be more impaired than New York's if New York law were applied to the negligent misrepresentation claims.

**B. Negligent misrepresentation**

To state a negligent misrepresentation claim under California law, plaintiff must allege: "(1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage." *Apollo Capital Fund LLC v. Roth Capital Partners, LLC*, 158 Cal. App. 4th 226, 243 (Cal. App. 2007).

The parties initially dispute whether a misrepresentation claim is subject to Rule 9(b)'s heightened pleading requirement or only Rule 8's "short and plain statement" requirement. Several courts within this district have applied Rule 9(b)'s heightened pleading requirements to negligent misrepresentation claims. *See, e.g., Vieste, LLC v. Hill Redwood Dev., Ltd.*, Case No. 09-4024 JSW, 2010 U.S. Dist. LEXIS 1807, *7 (N.D. Cal. Jan. 11, 2010); *Qureshi v. Countrywide Home Loans, Inc.*, Case No. 09-4198 SBA, 2010 U.S. Dist. LEXIS 21843, *12-13 (N.D. Cal. Mar. 9, 2010). The Ninth Circuit has not yet decided that issue. *But see Miller v. Int'l Bus. Mach. Corp.*, 138 F. App'x 12, 17 (9th Cir. 2005) (unpublished decision finding negligent misrepresentation claim only needs to satisfy Rule

---

[21] The Agencies' suggestion that California's interests are not implicated here because TAC is a resident of Colorado and the only connection to California was the purchase of the securities by TAC's broker in San Francisco, has already been rejected in this case. *See* April 13, 2010 Order [Docket No. 108] at 6 (noting that "[s]ince plaintiff's claimed injuries were caused at least in part by conduct within California, defendant's arguments regarding the inapplicability of California securities laws are invalid.").

8). As such, the Court will assume Rule 9(b) applies and will review the sufficiency of plaintiff's allegations in the light of the purpose of Rule 9(b)'s requirement, which is to "give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007).

**i. Misrepresentations of fact or opinion**

The Rating Agencies' overriding argument is that their ratings cannot be subject to a common law negligent misrepresentation claim because the ratings are opinions and not statements of fact. *See* Agencies' MTD at 16-18; Agencies' Reply at 6-7. The Rating Agencies do not explain in any detail how their credit rating process works or how the "opinions" with respect to the Trusts here were formed. Instead they rely primarily on cases under Section 11 of the Securities Act of 1933, that have held that credit ratings for securities are opinions not statements of fact, and that to be actionable under Section 11 plaintiffs must allege that the opinions were not truly held at the time the ratings were issued. *See In re IndyMac Mortgage-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 2010 U.S. Dist. LEXIS 61458, *40-41 (S.D.N.Y. June 21, 2010); *see also N.J. Carpenters Health Fund v. Residential Capital, LLC*, 2010 U.S. Dist. LEXIS 32058 (S.D.N.Y. Mar. 31, 2010); *N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 2010 U.S. Dist. LEXIS 47512 (S.D.N.Y. Mar. 29, 2010); *Tsereteli v. Residential Asset Securitization Trust 2006-A8*, 692 F. Supp. 2d 387 (S.D.N.Y. 2010); *but see In re Wells Fargo Mortg. Backed Certificates Litig.*, 712 F. Supp. 2d 958, 972-73 (N.D. Cal. 2010) (allowing Section 11 claims to proceed based, in part, on alleged misstatements contained in ratings included in the offering materials).[22]

The Agencies do not cite any cases applying California law to determine whether ratings such

---

[22] As the First Circuit recently noted, courts have been reluctant to allow Securities Act claims to proceed, particularly Section 11 claims, based on alleged misrepresentations contained in third-party ratings. *See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 2011 U.S. App. LEXIS 1254, *33 (1st Cir. Mass. Jan. 20, 2011). As the Court explained, "the absence of a scienter element may suggest special caution before classifying an accurate report of a third-party opinion as 'misleading' based on implied representations about subjective intent or qualifications known only to the third party." *Id.*

as the ones at issue here should be considered statements of opinion or representations of fact.[23] In California, "[u]nder certain circumstances, expressions of professional opinion are treated as representations of fact. When a statement, although in the form of an opinion, is 'not a casual expression of belief' but 'a deliberate affirmation of the matters stated,' it may be regarded as a positive assertion of fact. . . . Moreover, when a party possesses or holds itself out as possessing superior knowledge or special information or expertise regarding the subject matter and a plaintiff is so situated that it may reasonably rely on such supposed knowledge, information, or expertise, the defendant's representation may be treated as one of material fact." *Bily v. Arthur Young & Co.*, 3 Cal. 4th 370, 408 (1992) (citations omitted); *see also Anderson v. Deloitte & Touche*, 56 Cal. App. 4th 1468, 1476-1477 (Cal. App. 1997) (recognizing the same and treating "independent accountants' reports" as actionable misrepresentations).

Moreover, even if considered opinions, California recognizes "two exceptions to the rule that expressions of opinion are not actionable . . . . The first is that an expression of opinion is actionable if the party expressing it does not honestly entertain that opinion. The second exception arises when the party making the false representation of opinion has superior knowledge or special information." *Ogier v. Pacific Oil & Gas Dev. Corp.*, 132 Cal. App. 2d 496, 506-07 (Cal. App. 1955). Therefore, whether treated as a statement of material fact under *Bily* or considered an actionable opinion under *Ogier*, TAC may bring negligent misrepresentation claims against the Rating Agencies if plaintiff alleges that the

---

[23] In Reply, the Rating Agencies cite one California case for the proposition that "subjective assessments based upon weighing multiple complex factors—such as credit ratings—constitute expressions of opinion, not statements of fact." *See* Agencies' Reply MTD at 6-7 (citing *ZL Techs., Inc. v. Gartner, Inc.*, 709 F. Supp. 2d 789 (N.D. Cal. 2010)). In *ZL Techs*, however, the Court determined that the particular ratings at issue were non-actionable opinion because they were a "subjective assessment" of companies' abilities "to execute" and the companies' "completeness of vision," which in turn were determinations based primarily on the rater's view of how a particular market will develop, which itself was based upon interviews with customers and vendors. *ZL Techs., Inc. v. Gartner, Inc.*, 709 F. Supp. 2d at 797-799. The Rating Agencies have not made a similar showing demonstrating that their ratings for the structured ARS depended on such inherently subjective sources. Other cases relied on by the Ratings Agencies are inapposite for the same reason. *See Compuware Corp. v. Moody's Investors Servs.*, 499 F.3d 520 (6th Cir. 2007) (finding that a detailed credit report discussing a company's future creditworthiness that is reached through a deliberative process involving a ratings committee and information passed back and forth between the subject and the rating agency, did not contain any provably false factual connotations to sustain a defamation claim); *Jefferson County Sch. Dist. No. R-1 v. Moody's Investor's Servs.*, 175 F.3d 848, 855 (10th Cir. 1999) (statements in article about a school district's credit worthiness were too vague to support a defamation by implication claim).

Agencies did not honestly entertain the opinions about the ratings at the time they were issued.[24] Plaintiff does so here, consistent with Rule 9(b), by asserting that the Rating Agencies could not have honestly believed or reasonably entertained the ratings issued to the Trusts because: (1) under accepted industry statistical practices, the Rating Agencies would have had to set the "attachment points" for the Trusts' securities higher than they did, FAC ¶¶ 169-170; (2) the Rating Agencies failed to follow the "weakest link" approach in setting their ratings, FAC ¶¶ 171-172; and (3) the Rating Agencies, with their access to information regarding the structure of the securities and the auctions conducted, knew or reasonably should have known that the market was illiquid and not creditworthy. FAC ¶¶ 174-175. The Rating Agencies vigorously dispute the merit of plaintiff's claims, but the allegations are more than sufficient to put them on "notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d at 764.

Plaintiff's allegations here are much more detailed and specific than the ones at issue in the Section 11 cases relied on by the Rating Agencies. *See, e.g.*, *In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485 (S.D.N.Y. 2010) (an "inference that some employees believed that the ratings agencies could have used methods that better would have informed their opinions" insufficient "to support an inference that the ratings agencies did not actually hold the opinion about the sufficiency of the credit enhancements to justify each rating at the time each rating was issued"). These factually specific allegations also distinguish this case from *In re Merrill Lynch Auction Rate Secs. Litig.,* 2011 U.S. Dist. LEXIS 14053 (S.D.N.Y. Feb. 9, 2011). There, the Court dismissed a negligent misrepresentation claim against agencies who rated structured ARS offerings because there were no factual allegations that the ratings were "'incorrect at the time offered.'" *Id*., at *36 (quoting *N.J. Carpenters Health Fund v. Residential Capital, LLC*, 2010 U.S. Dist. LEXIS 32058, *6 (S.D.N.Y. Mar. 31, 2010)).

---

[24] This standard appears to be consistent with at least one Section 10(b) case from the Southern District of New York. *See Abu Dhabi Commer. Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155 (S.D.N.Y. 2009). There, the Court rejected Moody's and S&P's argument that their ratings for structured investment vehicles were "nonactionable opinion" because "'opinion may still be actionable if the speaker does not genuinely and reasonably believe it or if it is without basis in fact.'" *Id*. at 176 (quoting *In re IBM Corp. Sec. Litig*., 163 F.3d 102, 109 (2d Cir. 1998)).

Plaintiff has also alleged that given the complex and esoteric nature of the structured ARS here, and the fact that the Agencies actually helped structure the securities, the Ratings Agencies had vastly superior knowledge of how the structured ARS in this case actually worked, *see, e.g.*, FAC ¶¶ 124, 177. These allegations satisfy, for pleading purposes, the second exception to the rule that opinions are normally not actionable. *See Bily*, 3 Cal. 4th at 408; *Ogier*, 132 Cal. App. 2d at 506-07.

Finally, the parties' dispute over whether the Agencies' credit ratings were a false misrepresentation with respect to the securities' "liquidity" cannot be resolved on this motion. Plaintiff asserts that "an investment-grade rating inherently denotes a measure of liquidity,"Oppo. Agencies' MTD at 27, and the Agencies respond that their ratings express no fact or opinion about liquidity "in any terms," Agencies' Reply at 8. Whether consumers generally or QIBs specifically reasonably interpret the ratings at issue as a measure, in whole or in part, of a security's liquidity should be resolved by the trier of fact. Plaintiff's allegations that the two concepts are related is sufficient at this stage. *See also* Oppo. Agencies' MTD at 27-28 (citing to SEC rules and rule making proceedings which treat ratings as indicators of liquidity); Miller Decl. [Docket No. 151], Exs. A-C.

Therefore, whether the ratings for the structured ARS at issue here are considered statements of fact or opinions, given plaintiff's allegations, the Court determines that at this juncture they are actionable under California law.

**ii. Duty**

Under California law, a defendant may be held liable for negligent misrepresentation "in the dissemination of commercial information to persons who were 'intended beneficiaries' of the information." *Bily v. Arthur Young & Co.*, 3 Cal. 4th 370, 410 (1992). Under *Bily*, the "representation must have been made with the intent to induce plaintiff, or a particular class of persons to which plaintiff belongs, to act in reliance upon the representation in a specific transaction, or a specific type of transaction, that defendant intended to influence." *Id.*, 3 Cal. 4th at 414 (internal quotation omitted). As the Ninth Circuit has explained, "*Bily* creates an objective standard that looks to the specific circumstances to ascertain whether a supplier of information has undertaken to inform and guide a third party with respect to an identified transaction or type of transaction. If such a specific undertaking has

been made, liability is imposed on the supplier. If, on the other hand, the supplier 'merely knows of the ever-present possibility of repetition to anyone, and possibility of action in reliance upon [the information] on the part of anyone to whom it may be repeated,' the supplier bears no legal responsibility." *Glenn K. Jackson Inc. v. Roe*, 273 F.3d 1192, 1201 at n.3 (9th Cir. 2001) (quoting *Bily*, 3 Cal. 4th at 410).

Plaintiff alleges that the Rating Agencies have made a "specific undertaking" here, as the Rating Agencies were involved in structuring the securities at issue, knew that the securities had to be "investment-grade" to be marketed to QIBs, and knew that the select group of QIBs were the only entities who would be allowed to purchase them. FAC ¶¶ 130, 140-144, 167, 177, 180. The Ratings Agencies respond that because "thousands, and perhaps tens of thousands" of QIBs participate in this market, it is not a "circumscribed class" contemplated by *Bily*. However, although the class of QIBs might number in the thousands, it is still a circumscribed and identifiable group that the Ratings Defendants not only knew would have access to the ratings but who necessarily rely on the ratings in order to purchase investment grade securities. *See, e.g.*, *Nutmeg Securities, Ltd. v. McGladrey & Pullen*, 92 Cal. App. 4th 1435, 1445 (Cal. App. 2001) (class of potential "IPO underwriters" "sufficiently 'narrow and circumscribed class of persons'" for purposes of a duty of care under *Bily*).[25] This is not a case where the Ratings Agencies "merely knew" of the possibility of their ratings being repeated to third parties. Instead, this is a case where the Rating Agencies knew who would review and rely on their ratings and, allegedly, helped structure the very securities at issue so that they would be able to be marketed to the QIBs. In these circumstances, plaintiff has adequately pled that the Rating Agencies, "clearly intended to undertake the responsibility of influencing particular business transactions involving third persons." *Bily*, 3 Cal.4th at 408. Here, the marketing of the structured ARS at issue to the circumscribed group of QIBs.

---

[25] For this reason the decision in *Rice v. Charles Schwab*, 2010 U.S. Dist. LEXIS 135852 (C.D. Cal. Oct. 22, 2010) is inapposite. There, the Court held that a non-QIB investor who purchased shares of Fannie Mae and Freddie Mac was not within a circumscribed class of intended beneficiaries for the generally "published" credit ratings. The allegations here demonstrate, for purposes of this motion, that the select group of QIBs were intended beneficiaries of the ratings and that the ratings were not generally published, but incorporated into the offering materials for the unregistered ARS at issue.

**iii. Justifiable reliance**

A negligent misrepresentation claim requires plaintiff to plead "actual, justifiable reliance" on the Rating Agencies' representations. *See, e.g., Bily v. Arthur Young & Co.*, 3 Cal.4th at 413. The Ratings Agencies argue that plaintiff has failed to allege facts showing that its reliance on the ratings was justified. However, plaintiff's complaint alleges that given the complexity and novelty of the securities at issue, plaintiff had to rely on the ratings provided by the defendants who had access to non-public information. *See, e.g.*, FAC ¶¶ 119, 141. The Rating Agencies' response -- that plaintiff, a highly sophisticated QIB, should have done its own investigation and research – is misplaced. As noted above, plaintiff alleges that the Agencies had access to non-public information regarding the structure of the securities that was not available to QIBs like TAC, so TAC had to rely on the ratings. *Id*. ¶¶ 119, 141; *see also Abu Dhabi Commer. Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d 155, 181 (S.D.N.Y. 2009) ("the market at large, including sophisticated investors, have come to rely on the accuracy of credit ratings and the independence of rating agencies because of their NRSRO status and, at least in this case, the Rating Agencies' access to non-public information that even sophisticated investors cannot obtain. Plaintiffs accordingly have adequately pled their reasonable reliance on the ratings.").[26]

Finally, reasonableness of reliance on a misrepresentation is ordinarily a question of fact. *See, e.g., Guido v. Koopman*, 1 Cal. App. 4th 837, 843 (Cal. App. 1991). Whether reliance was justified in a particular circumstance "may only be decided as a matter of law if reasonable minds can come to only one conclusion based on the facts." *Id*. No such clear "conclusion based on the facts" is demonstrated here. Plaintiff has adequately alleged facts to support the allegations of reliance.

---

[26] In asserting that TAC should have undertaken its own investigation and not relied on the ratings, the Rating Agencies fail to explain how at the time that TAC was considering its purchase of the securities it could have discovered the then-non public information that underlies plaintiff's claims that the Rating Agencies made actionable misrepresentations. *But see Zanett Lombardier, Ltd. v. Maslow*, 815 N.Y.S.2d 547, 548 (App. Div. 1st Dep't 2006) (dismissing misrepresentation claim because, inter alia, "plaintiffs, as sophisticated investors, [could not] validly claim justifiable reliance . . . as they could have discovered the underlying condition and true nature of both companies by ordinary intelligence or with reasonable investigation"); *UST Private Equity Inv. Fund, Inc. v. Salomon Smith Barney*, 733 N.Y.S.2d 385, 386 (App. Div. 1st Dep't 2001) ("As a matter of law, a sophisticated plaintiff cannot establish that it entered into an arm's length transaction in justifiable reliance on alleged misrepresentations if that plaintiff failed to make use of the means of verification that were available to it . . . .").

**iv. Loss and causation**

Negligent misrepresentation requires a plaintiff to allege that its damages were "proximately caused" by defendant's conduct. *OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.*, 157 Cal. App. 4th 835, 874 (Cal. App. 2007). Proximate causation involves only a "connection with or relation" between the losses and the "facts misrepresented." *Id*. A plaintiff is not required to show "that a misrepresentation was the sole reason for the investment's decline in value" in order to establish loss causation. *Sparling v. Daou (In re Daou Sys.)*, 411 F.3d 1006, 1025 (9th Cir. 2005). Instead, "'[a]s long as the misrepresentation is one substantial cause of the investment's decline in value, other contributing forces will not bar recovery under the loss causation requirement' but will play a role 'in determining recoverable damages.'" *Id.* (quoting *Robbins v. Koger Props., Inc*., 116 F.3d 1441, 1447 n. 5 (11th Cir. 1997)). Moreover, allegations regarding "loss causation" are subject only to Rule 8(a)'s more lenient standards. *See, e.g., Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 346 (2005) (applying Rule 8(a)(2) standard in assessing loss causation).

The Agencies argue that plaintiff cannot plead loss causation because it was the collapse of the ARS market, not the ratings, that caused plaintiff's harm. However, plaintiff's allegations that but for the Agencies' misleading ratings (which allegedly assured investors that the structured ARS securities would perform like AAA rated short term securities and money market alternatives, FAC ¶¶ 113, 142, 166), they would not have purchased the securities at issue, are sufficient at this pleading stage. *See* FAC ¶¶ 140, 182; *see also St. Clare v. Gilead Scis., Inc.*, 536 F.3d 1049, 1057 (9th Cir. 2008) ("But so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings when the plaintiff's case can be rejected on evidentiary grounds."); *King County v. IKB Deutsche Industriebank AG,* 708 F. Supp. 2d 334, 343 (S.D.N.Y. 2010) ("To hold that plaintiffs failed to plead loss causation solely because the credit crisis occurred contemporaneously with [a special investment vehicle's] collapse would place too much weight on one single factor and would permit S&P and Moody's to blame the asset-backed securities industry when their alleged conduct plausibly caused at least some proportion of plaintiffs' losses."). Moreover, the fact that plaintiff's allegations pin the blame for their damages on both DBSI and the Ratings Agencies, does not undermine their loss causation allegations with respect to the Ratings

Agencies, given the alleged inter-connected roles that the defendants played to create and support the market for the structured ARS at issue.

Finally, plaintiff also alleges lost interest income caused by the fact that after the market collapsed in 2007, plaintiff was stuck earning the low "fail rate" level of interest set by the securities' PPMs, which was lower than the interest rate which would have applied if the Rating Agencies had accurately rated the securities in the first instance. FAC ¶¶ 90, 183, 184; Oppo. Agencies' MTD at 35. These allegations are not implausible and support plaintiff's allegations of loss connected to the Rating Agencies' conduct.

For the foregoing reasons, the Court concludes that TAC has adequately alleged claims for negligent misrepresentation under California law.

**C. Preemption**

The Rating Agencies argue that TAC's common law misrepresentation claims are completely preempted by the Credit Rating Agency Reform Act of 2006 (CRARA), 15 U.S.C. § 78o-7. The Agencies argue that the "preemptive scope" of the Act is found in two provisions. First, the provision of the Act granting the SEC exclusive authority to enforce the Act. 15 U.S.C. § 78o-7(c)(1) (Authorization Provision). Second, in exchange for registering as a NRSRO and submitting to the jurisdiction of the SEC under the statute, Congress provided that: "Notwithstanding any other provision of this section, or any other provision of law, neither the Commission nor any State (or political subdivision thereof) may regulate the substance of credit ratings or the procedures and methodologies by which any nationally recognized statistical rating organization determines credit ratings." *Id.*, § 78o-7(c)(2) (Limitation Provision). Under this rubric, the Agencies assert, no state law claims based on the application of or a departure from an Agency's rating are allowed to proceed.

While Congress may "expressly preempt" and displace state law, preemption can only be found where it is the "'clear and manifest purpose of Congress.'" *Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134, 2010 U.S. App. LEXIS 18322, *34 (9th Cir. 2010) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). Moreover, in determining the reach of a preemption provision, the Court should adhere closely both to the intent of Congress and also to the general presumption against

preemption of state law claims. *See, e.g., Wyeth v. Levine*, 129 S. Ct. 1187, 1194 (2009). Thus, when "the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'" *Altria Group, Inc. v. Good*, 129 S. Ct. 538, 543 (2008) (quoting *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005)).

With those considerations in mind, and adhering closely to the express language of the CRARA, the Court rejects the Rating Agencies' argument. As an initial matter, there is no indication in the text of the statute or its legislative history that Congress intended to wipe out *all* state law causes of action against rating agencies. The Authorization Provision gives the SEC exclusive authority to enforce the provisions of the CRARA and rules issued by the SEC,[27] but there is no language to indicate that the SEC's exclusive authority extends to enforcement of claims that arise from sources *other* than the CRARA. The Limitations Provision is likewise limited, and prohibits *only* laws that seek to regulate the "substance of credit ratings" or the "procedures or methodologies" by which NRSROs determine credit ratings. There is nothing in the legislative record cited by the Agencies to support their expansive preemption argument. *See, e.g., Medtronic, Inc. v. Lohr*, 518 U.S. 470, 491 (1996) (plurality opinion) ("nothing in the hearings, the Committee Reports, or the debates . . . suggest[ed] that any proponent of the legislation intended a sweeping pre-emption of traditional common-law remedies against manufacturers and distributors of defective devices. If Congress intended such a result, its failure even to hint at it is spectacularly odd, particularly since Members of both Houses were acutely aware of ongoing product liability litigation.").[28]

In Reply, the Agencies raise a new preemption argument. They argue that TAC's reliance on

---

[27] The CRARA's "broad examination authority" permits the SEC "to examine an NRSRO on a periodic basis for compliance with substantive Commission rules applicable to NRSROs, including rules addressing conflicts of interest and rules prohibiting certain unfair, coercive, or abusive practices." *The Role and Impact of Credit Rating Agencies on the Subprime Credit Markets*: Hearing Before S. Comm. On Banking, Housing and Urban Development, 110th Cong. (2007) (statement of Christopher Cox, Chairman, SEC); Ehrlich Decl. [Docket No. 132], Ex. G.

[28] The Rating Agencies do not cite any Congressional testimony, for example, discussing the burden that state law claims place on NRSROs or how those claims impair the effective operation of the organizations, and relatedly, the financial markets. As TAC points out, the Congressional testimony is primarily focused on the need to provide additional methods to rein in deceptive practices of NRSROs. *See* Senate Report No. 109-326 at 1, 3 (noting CRARA intended to improve ratings quality by fostering accountability, transparency and competition in the ratings industry); Miller Decl. [Docket No. 151], Ex. E.

the Superior Court decision in *California Pub. Employees' Ret. Sys. v. Moody's Corp.*, No. CGC-09-490241, slip op. (Cal. Super. Ct. June 1, 2010) ("*Calpers*") – where the Court found that the Rating Agencies reading of the CRARA would "completely immunize" them from liability – is wrong in light of the "savings clause" in 15 U.S.C. § 78o-7(o)(2). The "savings clause" in subsection (o)(2), however, must be read in conjunction with (o)(1). Section 78o-7(o)(1) provides that no law of any state requiring the "registration, licensing or qualification" of a credit rating agency may be applied to a NRSRO. Section (o)(2) provides that "[n]othing in this subsection," meaning subsection (o), prohibits the securities commission of any State from bringing an enforcement action with respect to fraud or deceit against an NRSRO. That savings clause, therefore, is a limited carve-out to the claims prohibited in subsection (o)(1). It has no relevance to claims not described in subsection (o)(1), except to the extent that it shows that Congress knows how to explicitly bar a class of claims, and save a subset of them with a savings clause, and, therefore Congress' failure to expressly prohibit general claims of fraud and deceit against NRSROs like the one at issue here, further weighs against a finding of preemption.

Finally, even if the CRARA could be read to preempt common law causes of action based on allegations that NRSRO's *apply* deficient standards or inadequate procedures and methodologies in their credit ratings – and this Court does not conclude it does[29] – that is not what plaintiff seeks to do here. Instead, plaintiff seeks to hold the Rating Agencies liable for purported misrepresentations that allegedly would not have occurred if the Agencies had followed their own published procedures and methodologies. *See, e.g.*, FAC ¶ 172. There is nothing in either the text of the statute or the legislative history to establish that Congress intended to preempt a common law negligent misrepresentation claim based in part or in whole on allegations that credit agencies failed to follow their own practices. Similarly, with respect to plaintiff's argument that the ratings were false and misleading because the Agencies failed to apply "accepted industry statistical practices" in setting the attachment points for the securities, *see* FAC ¶¶ 169-170, if discovery shows that the Rating Agency defendants normally

---

[29] This Court is aware of only one other federal district court which has been faced with the issue of the preemptive scope of the CRARA. That Court stated that the Act did "not appear, at first impression, to stand for the broad proposition that Moody's argues it does," and the Court was "not prepared to hold that the Credit Rating Agency Reform Act preempts the application of state blue sky laws to credit rating agencies who have registered as NRSROs." *In re Nat'l Century Fin. Enters.*, 580 F. Supp. 2d 630, 651 (S.D. Ohio 2008).

United States District Court
For the Northern District of California

followed the "accepted industry statistical" standards alleged, plaintiff's claims would likewise not be preempted.[30]

For the foregoing reasons, the Rating Agencies' preemption argument is rejected.

**D. First Amendment**

The Rating Agencies' final argument is that plaintiff's claims against them are barred by the First Amendment. The Agencies rely on cases holding that specific types of ratings activity are predictive opinions that, by their nature, are too indefinite to imply a false statement of fact. *See* Agencies' MTD at 46-47; Agencies' Reply at 23-25. In each of the cases, the Courts' conclusions were based on a detailed analysis of the specific type of credit rating, including the types of information gathered and processed by the credit rating agency and the sources of that information, as well as the alleged defamatory statements at issue. *See Compuware Corp. v. Moody's Investors Servs.*, 499 F.3d at 522, 528-29 (finding that a detailed credit report discussing a company's future creditworthiness that is reached through a deliberative process involving a ratings committee and information passed back and forth between the subject and the rating agency, did not contain any provably false factual connotations to sustain a defamation claim); *Jefferson County Sch. Dist. No. R-1 v. Moody's Investor's Servs.*, 175 F.3d at 855 (statements in article about a school district's credit worthiness were too vague to support a defamation by implication claim); *cf. Newby v. Enron Corp.* (*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*), 511 F. Supp. 2d 742, 825 (S.D. Tex. 2005) (dismissing claim against rating agencies in light of the nature of the credit rating at issue there – a widely disseminated credit report of Enron Corporation – because plaintiff only made conclusory allegations regarding the credit rating agencies' roles and failed to detail the circumstances or the language of any of the agencies' reports plaintiff claimed were factual statements that were provably false).

Here, plaintiff has specifically identified the alleged misstatements at issue, and nothing in the record at this stage suggests that the structured ARS ratings at issue are, in fact, predictive opinions by

---

30 If, however, discovery shows that the Rating Agencies did not follow the accepted industry statistical practices but used materially different practices, defendants may ask the Court to revisit whether specific claims asserted by plaintiff are preempted.

their nature "too indefinite" to imply a false statement of fact.

The argument that under the First Amendment, plaintiff must plead "actual malice" with respect to the alleged misstatements in this case is also rejected. In *Compuware*, the Court applied the "actual malice" standard to Compuware's defamation claim, which was based upon allegedly misleading information published by Moody's in a detailed credit report about Compuware. The actual malice standard applied in that case, however, only because Compuware was a public figure. *Id*. 499 F.3d 520 at 525. There has been no showing here that the Trusts – who were the ones rated and who are not bringing defamation claims against the Rating Agencies – are "public figures."

Moreover, while other Courts have applied the actual malice standard to claims against rating agencies, they did so only where the ratings were matters of "public concern." In *Abu Dhabi Commer. Bank v. Morgan Stanley & Co.*, 651 F. Supp. 2d at 175, the Court held that credit ratings for a structured investment vehicle, that were only available to a limited group of investors, were not matters of public concern afforded the "actual malice" level of protection. *Id*. at 176; *see also LaSalle Nat'l Bank v. Duff & Phelps Credit Rating Co.*, 951 F. Supp. 1071, 1096 (S.D.N.Y. 1996) (rejecting actual malice protection where credit rating was "privately contracted for and intended for use in the private placement Offering Memoranda, rather than for publication in a general publication"); *cf. In re Enron Corp. Sec., Derivative & "ERISA" Litig*. 511 F. Supp. 2d at 825 (S.D. Tex. 2005) (concluding "that the actual malice standard should apply here because the nationally published credit ratings focus upon matters of public concern, a top Fortune 500 company's creditworthiness."). The Court in *In re Nat'l Century Fin. Enters*., 580 F. Supp. 2d 630, 640 (S.D. Ohio 2008) reached the same conclusion where the ratings were disseminated only to "a select class of institutional investors with the resources to invest tens of millions of dollars in the notes." *Id*. Plaintiff's allegations, that the ratings at issue here were likewise only distributed to the select group of QIBs, satisfies the Court – at this juncture – that the First Amendment does not require TAC to meet the "actual malice" standard for its misrepresentation claims. FAC ¶¶ 180, 254, 268.[31]

---

[31] Plaintiff's allegation that the "investing public" and the "marketplace" relied upon the ratings, FAC ¶¶ 5-6, 50, 55, does not undermine their allegation that only the select group of QIBs had access to the ratings. For purposes of the securities at issue, the "investing public" and "marketplace" were the select group of QIBs who were able to purchase the securities.

United States District Court
For the Northern District of California

For the foregoing reasons, the Rating Agencies' Motion to Dismiss is DENIED.

**4. Fitch Ratings, Ltd. motion to dismiss for lack of personal jurisdiction**

Fitch Ratings, Ltd. (FRL) separately moves to dismiss the complaint against it for lack of personal jurisdiction under Rule 12(b)(1). "Although the defendant is the moving party on a motion to dismiss, the plaintiff bears the burden of establishing that jurisdiction exists." *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002) (citation omitted). In adjudicating a personal jurisdiction motion, the Court must accept as true the uncontroverted allegations in the complaint, and where the motion is based on written materials, plaintiff need only make a *prima facie* showing of jurisdiction. *Dole Food Co. Inc. v. Watt*, 303 F.3d 1104, 1108 (9th Cir. 2002).

The Court's exercise of personal jurisdiction must comport both with the state long-arm statute and with the constitutional requirements of due process. *Omeluk v. Langsten Slip and Batbyggeri A/S*, 52 F.3d 267, 271 (9th Cir. 1995) (citing *Chan v. Society Expeditions, Inc.*, 39 F.3d 1398 (9th Cir. 1994)). California's long-arm statute confers jurisdiction over nonresident defendants to the extent permitted by the California or United States Constitution. *See* Cal. Code of Civ. Proc. § 410.10. Therefore, the jurisdictional inquiry collapses into a single analysis of due process. Absent traditional bases for personal jurisdiction (physical presence, domicile or consent), due process requires that the defendant have certain minimum contacts with the forum state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. *See International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

The Court must determine whether sufficient minimum contacts between moving defendants and the forum state exist to allow the exercise of personal jurisdiction over them. In this regard, courts may exercise either general or specific jurisdiction over nonresident defendants. *FDIC v. British-American Ins. Co., LTD*, 828 F.2d 1439, 1442 (9th Cir. 1987). Here, plaintiff asserts that the Court has specific jurisdiction over the non-resident defendant. The Ninth Circuit has held that:

> a court may exercise 'specific jurisdiction' when the following requirements are met:
>
> (1) The non-resident defendant must purposefully direct his activities or consummate

> some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privileges of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Dole Food*, 303 F.3d at 1111.

To establish FRL's role in the ratings at issue, plaintiff relies on the written rating letters for the DBSI ARS. These letters were issued on "DerivativeFitch" letterhead and state that "Fitch assigns the ratings indicated above" to the Trusts. *See* Declaration of Kevin J. Miller, Exhibits A-D at 1 respectively. Each of the ratings letters also includes the following language: "Fitch means Fitch, Inc., Fitch Ratings, Ltd. and their subsidiaries including DerivativeFitch, Inc. and DerivativeFitch Ltd. and any successor or successors thereto." *Id.*, Exs. A-D at 1.[32]

FRL supports its Motion with the declaration of Kevin Kendra, the head of the group that rated the ARS in question. Mr. Kendra declares that: "Fitch, Inc. issued ratings for Pivot Master Trust Series 1, Capstan Master Trust Series 1, and Capstan Master Trust Series 2. The research and decisions relevant to these ratings occurred in New York and Chicago." Declaration of Kevin Kendra ¶ 5. Mr. Kendra also declared that he was "personally familiar with the form of rating letter sent in connection with the transactions at issue in this case" and that "Fitch, Inc. included in its ratings letters to Pivot Master Trust and Capstan Master Trust the boilerplate statement 'Fitch means Fitch, Inc., Fitch Ratings, Ltd. and their subsidiaries including Derivative Fitch, Inc. and Derivative Fitch Ltd. and any successor or successors thereto' because the correspondence sent to the issuers here was a form letter in which such language is included as a matter of course." *Id.*, ¶ 7. FRL also submits the declaration of David Samuel, the CFO of FRL, who declares that FRL is a London-based company organized under the laws of England and Wales that "primarily issues ratings for issuers and issuances in Europe (including the United Kingdom), the Middle East, Africa, and Asia." Declaration of David Samuel ¶ 3, 5. Mr. Samuel

[32] Plaintiff also relies, as evidentiary support for its motion, on the fact that certain of the PPMs issued by DBSI provide that the securities could not issue unless they were rated by Fitch Ratings, Ltd. Oppo. at 1; *see also* Ex. G to Miller Decl. However, documents drafted solely by DBSI cannot be used against FRL to establish jurisdiction.

United States District Court
For the Northern District of California

further declares that: "Based on a reasonable inquiry of persons in the current employ of Fitch Ratings Ltd, Fitch Ratings Ltd did not rate Pivot Master Trust Series 1, Capstan Master Trust Series 1, or Capstan Master Trust Series 2." *Id.*, ¶ 20.

Based on the evidence submitted, the Court finds that FRL should be dismissed for lack of personal jurisdiction. The only direct evidence provided by plaintiff to counter the Kendra and Samuel declarations is the rating letters themselves, that define "Fitch" to mean all Fitch entities and subsidiaries, including FRL. The Court agrees that this slim reed is insufficient to establish that FRL played a role in the ratings, especially in light of Mr. Kendra's declaration that the language relied upon by plaintiff is simply "boilerplate" language used in form letters and Mr. Samuel's declaration that FRL did not rate the securities at issue. *See, e.g., Faro Techs., Inc. v. CimCore Corp.*, 2006 U.S. Dist. LEXIS 43404, *14-15 (M.D. Fla. June 26, 2006) (finding lack of jurisdiction where use of defendant's name on allegedly defamatory white paper was meant as trademark use and not intended to identify specific defendant).

For the foregoing reasons, FRL is DISMISSED without prejudice for lack of personal jurisdiction. If discovery establishes that FRL did play a role in rating the securities at issue, plaintiff may ask the Court to revisit this issue.

**5. Requests for judicial notice, evidentiary objections and requests to file supplemental authority**

DBSI asks the Court to take judicial notice of the 2006 SEC cease-and-desist order as well as various news articles and the transcript of the March 23, 2010 hearing in *Teva Pharmaceutical Industries v. Deutsche Bank AG, et al.*, Case No. 09-cv-6205 (AKH). [Docket No. 124].[33] Plaintiff objects to the request with respect to the articles and the transcript. [Docket No. 145]. The Court GRANTS the requests with respect to the news articles, and takes notice of them as relevant to the issue of inquiry notice and what information was in the public realm regarding auction rate securities, but not whether the contents of the facts in those articles were in fact true. *See In re Wells Fargo Mortg.*

[33] As noted above, see fn. 6 supra, the Court has taken judicial notice at the request of both sides of the 2006 cease-and-desist order issued by the SEC.

United States District Court
For the Northern District of California

*Backed Certificates Litig*., 712 F. Supp. 2d 958, 966 n.2 (N.D. Cal. 2010). The Court also GRANTS the request with respect to the *Teva Pharmaceutical* transcript for the purposes of noting the Court's decision, but not for the truth of the facts recited therein. *See Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001).

The Rating Agencies ask the Court to take judicial notice of a complaint filed by the New York Attorney General, as well as congressional testimony. [Docket No. 133 & Exs. D-G of Erlich Decl.]. Plaintiff objects to the request with respect to "facts" asserted in Exhibit D and the Congressional testimony in Exhibit G. [Docket No. 145]. As above, the Court GRANTS the request with respect to the existence of the complaint filed by the New York Attorney General and GRANTS the request with respect to the existence of the congressional testimony. *See 321 Studios v. MGM Studios, Inc*., 307 F. Supp. 2d 1085, 1107 (N.D. Cal. 2004).

DBSI objects to exhibits D and E attached to the Declaration of David L. Schwartz in Support of Plaintiff's Opposition to DBSI's MTD [Docket No. 143] on the grounds of relevance. [Docket Nos. 161, 177]. The relevance objections are OVERRULED. DBSI also objects to exhibits E, F and G attached to the Declaration of David L. Schwartz in Opposition to DBSI's and the Rating Agencies' Requests for Judicial Notice [Docket No. 146] on the grounds of relevance. [Docket Nos. 162, 178]. The relevance objections are OVERRULED.

TAC requests that the Court take judicial notice of a press release issued by Deutsche Bank AG and a structured credit criteria report issued by Fitch Inc. and FRL. [Docket No. 152]. Fitch Inc. and FRL object to the request for judicial notice of only the structured credit criteria report, arguing that judicial notice of an entity's internal policies is not appropriate where the entity is not a public agency. [Docket No. 169]. The Court GRANTS judicial notice of the unobjected to press release and DENIES the request for judicial notice of the structured credit criteria report.

Fitch Inc. and FRL request the Court take judicial notice of Fitch's "terms of use" which was in effect in late 2007 and early 2008 arguing that the terms were incorporated by reference in the complaint through the FAC's reference to two Fitch, Inc. press releases. [Docket No. 170]. The Court finds that the terms of use were not referenced, or otherwise incorporated by reference into the FAC and are not otherwise properly subject to judicial notice. The request is DENIED.

United States District Court
For the Northern District of California

TAC has also filed numerous requests for leave to file statements of supplemental authority. [Docket Nos. 182, 187, 205]. The Rating Agencies and DBSI have also filed motions for leave to file statements of recent decisions. [Docket No. 209, 213]. Those requests and motions are GRANTED.

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court hereby:

(1) DENIES DBSI's Motion to Dismiss, with the limited exception of plaintiff's omissions based claims which are DISMISSED without leave to amend;

(2) DENIES DSBI's Motion to Strike;

(3) DENIES the Rating Agencies' Motion to Dismiss:

(4) GRANTS Fitch Ratings, Ltd. Motion to Dismiss for lack of personal jurisdiction without prejudice.

**IT IS SO ORDERED.**

Dated: March 27, 2011

Susan Illston

SUSAN ILLSTON
United States District Judge